UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| XUE SHAN WANG, Plaintiff, -against- NEW YORK CITY DEPARTMENT OF YOUTH AND COMMUNITY DEVELOPMENT et al., Defendants. | : | 21 Civ. 6271 (LGS) **<u>OPINION & ORDER</u>** |

LORNA G. SCHOFIELD, District Judge:

Plaintiff Xue Shan Wang brings this employment discrimination action against Defendants New York City Department of Youth and Community Development ("DYCD"), the City of New York ("NYC") and DYCD employees Nevita Bailey, Lisa Thornton and Ardis Sanmoogan (the "Individual Defendants"). Plaintiff asserts claims for disability discrimination and retaliation under the Americans with Disabilities Act ("ADA"), the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL"). Plaintiff also asserts a retaliation claim under the Family and Medical Leave Act ("FMLA"). Defendants' motion for summary judgment is granted on the federal claims, and the Court declines to exercise supplemental jurisdiction over the state and city claims, which are dismissed without prejudice to refiling in state court.

## I. BACKGROUND

The following facts are taken from the parties' Rule 56.1 statements and other submissions on this motion. The facts are undisputed unless noted or are based on record evidence, with all reasonable inferences drawn in favor of Plaintiff as the non-moving party. *See N.Y. State Teamsters Conf. Pension & Ret. Fund v. C & S Wholesale Grocers, Inc.*, 24 F.4th 163, 170 (2d Cir. 2022).

### A. Plaintiff's Employment and Medical Conditions

Plaintiff was employed by Defendant DYCD from July 2016 until her termination in August 2025.[1] Plaintiff began as a Senior Budget Analyst in DYCD's Bureau of Budget and Finance and worked in that position for most of the relevant period. Her duties generally included preparing, tracking and analyzing budgets and expenses.

Defendant Sanmoogan, a Senior Budget Director, was Plaintiff's direct supervisor during the relevant period. Defendant Bailey (Assistant Commissioner and Deputy Chief Financial Officer) and Jagdeen Phanor (Associate Commissioner and Chief Financial Officer) were also in Plaintiff's chain of command.

In April 2017, Plaintiff was promoted to Administrative Staff Analyst. Less than a year later, Plaintiff requested to return to the Senior Budget Analyst position on the basis that her medical condition of palatal myoclonus prevented her from performing the workload associated with the promotion. Plaintiff's request was granted in February 2018.

Plaintiff was diagnosed with palatal myoclonus in June 2017. According to Plaintiff's doctor, palatal myoclonus is a movement disorder like Parkinson's that occurs in an individual's throat region. Speaking and chewing cause Plaintiff's palate to spasm, and excessive stress worsens her symptoms. As a result of her palatal myoclonus, Plaintiff experiences a "clicking" sound in her ear, as well as ear pain, ear ringing, throat pain, dry throat, nausea, headache and difficulty breathing.

[1] As stated in the Order dated April 28, 2026, Plaintiff's August 2025 termination is considered as part of the summary judgment record even though Plaintiff did not file a Second Supplemental Complaint incorporating that fact.

Plaintiff was formally diagnosed with, and began treatment for, anxiety disorder related to stress at work in May 2018. Plaintiff described her anxiety disorder as "[f]ear, frustrated, nervous, cannot sleep."

Before Plaintiff's medical leave in 2018, Sanmoogan considered Plaintiff "an exemplary employee." Sanmoogan, Phanor and Defendant Thornton (Assistant Commissioner of Human Resources) all testified that they did not believe Plaintiff was ever written up or otherwise disciplined prior to taking leave.

### B. April through October 2018 -- Medical Leave, Return to Work and First Disciplinary Memorandum

In April 2018, Plaintiff requested a reduced workload due to work-related stress. That request was denied. Around the same time, Plaintiff requested, and was granted, almost six months of medical leave -- twelve weeks of FMLA leave, followed by non-FMLA leave -- beginning May 2, 2018, and ending October 18, 2018. Plaintiff returned to work on October 11, 2018.

Before returning, Plaintiff emailed her union representative requesting to transfer to a different unit due to her medical condition. Plaintiff wrote, "I am not able to continue working under Jagdeen Phanor and Ardis Sanmoogan. Working under them is very stressful. They assigned me lots of work tasks. . . . They also said things about me that are not true, and make me look[] bad." Thornton informed Plaintiff that when she returned her supervisor would be Sanmoogan, effectively denying Plaintiff's request to transfer. On October 10, 2018, Plaintiff filed an inquiry with the Equal Employment Opportunity Commission ("EEOC") regarding the transfer denial, asserting that her request for reasonable accommodation had been denied and stating her "worry [that] they will put me on disciplinary matters again if I am not able to work due to my medical condition."

The day after Plaintiff returned to work, Sanmoogan gave Plaintiff her Tasks and Standards document for 2018. DYCD's Chief of Staff testified that a Tasks and Standards document is provided to unionized city employees and outlines the duties associated with their title. Bailey testified that the document is meant to give employees "an understanding of the position" and "may be edited or revised throughout the year." Plaintiff subsequently emailed Sanmoogan that she needed to discuss the Tasks and Standards with her union because she was concerned that she would not be able to complete the thirteen listed tasks within her thirty-five-hour workweek. Plaintiff also noted that the Tasks and Standards covered a ten-month period even though she would only be present for the final three months. DYCD in-house counsel Penney Vachiraprapun, who was copied on the email chain, asked how Plaintiff's Tasks and Standards compared with that of other similarly situated employees in Plaintiff's unit. Sanmoogan responded that Plaintiff's Tasks and Standards "mirror[ed]" that of previous Senior Budget Analysts.

On October 19, 2018, eight days after Plaintiff's return to DYCD, Sanmoogan issued Plaintiff a memorandum titled "Failure to Perform Assigned Work" (the "October 2018 Memorandum"). The October 2018 Memorandum stated that Plaintiff had not completed any work since her return and had missed four meetings concerning her work (the same meeting rescheduled three times) while she was consulting her union representative about her Tasks and Standards. The memorandum underscored DYCD's Code of Conduct, which requires employees to perform duties "imposed by law or by the employee's Task[s] and Standards" notwithstanding any pending grievance filed by the employee, and warned Plaintiff that "failure to adhere to the Code of Conduct could result in formal disciplinary action."

In contemporaneous internal correspondence, Vachiraprapun suggested that the warning to Plaintiff be sent as a formal memorandum "so we can get started with the progressive discipline steps." Phanor responded, "Memo it is!" and Sanmoogan replied, "Excellent!" Several days later, Thornton circulated medical notes submitted by Plaintiff and wrote, "Perhaps we need [to] clarify what is meant by 'overwork or stress.'" Vachiraprapun responded, "Please clarify that for me, as well. Maybe I should be re-writing my T&S [Tasks & Standards]!!," followed by three smiley-face emoticons.

**C. November through December 2018 -- Accommodation Requests and Continuing Work Disputes**

On November 15, 2018, Plaintiff submitted two accommodation requests. First, in connection with her palatal myoclonus, Plaintiff requested to "switch all speaking roles with another employee so that her duties entail no speaking." A doctor's note submitted with the request stated that Plaintiff "has worsening of symptoms with Excessive Stress and Overuse such as Speaking or Chewing," that "[s]he is not permitted to have overtime or excessive speaking work" and that she "needs to reduce time spent continuously speaking to ten minutes with thirty minutes to an hour break of silence in between." This request was granted. Soon afterward, DYCD provided Plaintiff with text-to-speech software and permitted Plaintiff to communicate by email.

Second, in connection with her anxiety disorder, Plaintiff requested to transfer to a specified open position in a different unit. Plaintiff believed that the position did not require speaking and had "less tasks than what Ms. Sanmoogan" assigned her. A psychiatrist's note submitted with the request stated that Plaintiff "has been treated for Anxiety disorder since May 7, 2018, [which] is related to stress at work." Thornton encouraged Plaintiff to apply for the position and told her that, while she would have to interview for the role, they could discuss

accommodations for the interview process. Plaintiff ultimately declined to interview because, given her medical condition, she did not believe she could sit for an interview with an accommodation of any kind. As a result, Plaintiff did not transfer units.

Meanwhile, Plaintiff and her supervisors continued to dispute Plaintiff's workload and responsibilities. On November 16, 2018, Sanmoogan emailed Plaintiff a "[f]ollow up" to the October 2018 Memorandum, stating that Plaintiff still had not completed any assigned work since her return the previous month. Sanmoogan wrote, "Your Tasks and Standards . . . summarize the duties of your position and are not an exacting or exhaustive list of the duties you are expected to perform. As with every employee at this and any other City agency, a supervisor cannot be expected to refer to an employee's Tasks and Standards every time a duty is assigned." In the same email, Sanmoogan asked Plaintiff to update the "[d]iscretionary portfolio" for fiscal year 2019, a task Plaintiff had previously performed for fiscal year 2018. Plaintiff responded that the October 2018 Memorandum included "unreasonable charges and [a] made up story." Plaintiff further said that she did not remember how to update the discretionary portfolio after her six-month absence and needed training.

Following that exchange, Vachiraprapun advised Sanmoogan and others that "the best way to proceed is to draft an email including every single task [Plaintiff] has failed to complete since returning, and every single meeting she has failed to attend," explaining that "this will be really helpful if/when we need to bring formal disciplinary charges against [Plaintiff], or if we need to defend any charges of discrimination should she raise any such claims." Thornton testified that around this time, DYCD had discussed pursuing disciplinary charges against Plaintiff as a "last measure" because Plaintiff had ceased performing "the essential functions of

her job." Likewise, Sanmoogan testified that there was a "distinct drop-off in [Plaintiff's] performance" after she returned from leave.

On November 21, 2018, Plaintiff emailed Thornton and others reiterating her desire to transfer units, stating that "[a]s long as I am working under this Unit, I need to worry [whether] everything that I am doing and saying . . . would cause a later charge by my supervisors." Plaintiff stated that the allegations in the October 2018 Memorandum and the November 16, 2018, follow-up email from Sanmoogan were untrue.

On November 23, 2018, Vachiraprapun emailed Thornton that Plaintiff had "start[ed] to work," but that Sanmoogan was "extremely frustrated that every task assigned requires so much back-and[-]forth" and was "concerned that she will have to retrain [Plaintiff] on tasks she believes [Plaintiff] should be proficient in." According to Vachiraprapun, Sanmoogan had "again raised the question of why we can't bring disciplinary charges to make [Plaintiff] work," to which Vachiraprapun responded that "we are trying to see things through in a measured way."

The parties continued to dispute whether certain assignments fell within Plaintiff's Tasks and Standards. For example, in December 2018, Plaintiff questioned whether preparation of a quarterly financial report for the Community Services Block Grant ("CSBG") fell within her assigned duties and threatened to file a grievance if Sanmoogan could not tie the task to a specific Task and Standard. Sanmoogan responded that all of the tasks assigned to Plaintiff comported with Plaintiff's Tasks and Standards, "which, like those of all employees[], are written in a general way." Plaintiff's 2018 Tasks and Standards document listed tasks related to CSBG.

**D. 2019 -- EEOC Interview and Second Medical Leave**

On January 2, 2019, Plaintiff attended an interview regarding the EEOC inquiry she had submitted in October 2018. Plaintiff's supplemental submission in support of the inquiry alleged, among other things, that Sanmoogan and Phanor assigned Plaintiff an unmanageable

workload, including by giving her new tasks and tasks that belonged to other groups; criticized her performance; asked to video record her while she was working and falsely accused her of refusing to complete assignments.

On March 29, 2019, Plaintiff requested, and was granted, non-FMLA medical leave from May 20, 2019, through September 30, 2019. Plaintiff returned to work on October 1, 2019. When she returned, she received a Tasks and Standards document for 2019. The parties dispute whether the document she received listed twelve or fourteen tasks.

### E. 2020 -- Opposed Transfer, Second Disciplinary Memorandum, EEOC Charge and Unpaid Suspension

On February 7, 2020, Thornton invited Plaintiff to a meeting to discuss Plaintiff's November 2018 request to transfer units. Plaintiff responded that she was "confused" because she had not applied to any position and no longer wished to leave her current role. Plaintiff testified that by this time, her stance had changed because Sanmoogan had "accommodated [her] need" by reducing her workload and communicating with her by email. Emails from Plaintiff and Plaintiff's later EEOC charge stated that her workload was reduced in 2019.

During a meeting held on February 19, 2020, DYCD discussed transferring Plaintiff to a Facilities and Operations Analyst position in the Cornerstone Unit. Thornton testified that DYCD proposed the transfer because Plaintiff had "expressed displeasure in her current assignment." Phanor testified that DYCD believed the role would be a "great fit" for Plaintiff because the role did not require much speaking. A week later, Bailey sent Plaintiff a description of the position and asked when Plaintiff could meet with the Cornerstone team. Plaintiff responded, "I have mentioned twice already that I am not planning to leave my current job."

On March 9, 2020, Plaintiff emailed DYCD Deputy Commissioner Alan Cheng stating that Thornton and others were attempting to persuade her to take a position she did not want.

Plaintiff explained that she did not wish to leave her current role because "Sanmoogan reduced my work load and I am currently not on Anxiety Disorder medication." Plaintiff opposed the transfer on the basis that the new position, which involved working with data and spreadsheets, was unfamiliar and did not fit her skillset.

At Cheng's request, Thornton responded stating that since Plaintiff's return from leave, her "productivity and ability to meet [the unit's] deadlines have decreased, [and] the workload and workflow of the unit have been substantially impacted." As a result, according to Thornton, "DYCD explored and was able to find a suitable, comparable position for you in another unit." Thornton emphasized that it was "solely within DYCD's discretion to assign staff to meet the needs of the agency." Ultimately, Plaintiff was not transferred to the Cornerstone Unit. Thornton testified that DYCD abandoned the transfer because of Plaintiff's objections.

On May 15, 2020, Sanmoogan issued Plaintiff a second memorandum titled "Failure to perform assigned tasks" (the "May 2020 Memorandum"). The May 2020 Memorandum documented Plaintiff's repeated refusal between October 2019 and May 2020 to submit Neighborhood Development Area Bank Reconciliation Reports, a task DYCD maintained fell within Plaintiff's Tasks and Standards. The May 2020 Memorandum stated, "Your continued refusal to perform appropriately assigned tasks has continuously disrupted DYCD's Bureau of Budget and Finance operations, delayed the submission of agency reporting to oversight agencies, and caused inequity within the unit due to the reassignment of work you refuse to complete." Like the October 2018 Memorandum, the May 2020 Memorandum warned Plaintiff that continued refusal to perform assigned tasks could result in disciplinary action.

On May 29, 2020, Plaintiff filed a charge of discrimination with the EEOC. The charge alleged that DYCD's February 2020 attempt to transfer Plaintiff to the Cornerstone Unit was

discriminatory and retaliatory on the basis of race and disability. Plaintiff asserted that she had been told that Sanmoogan "no longer want[s] to work with me under the conditions of my reasonable accommodation for my Palatal Myoclonus disability." The EEOC notified DYCD of Plaintiff's charge on July 13, 2020.

On November 17, 2020, DYCD issued Plaintiff a Notice and Statement of Charges and Specifications (the "November 2020 Notice"), which contained two charges and a request for suspension. The first charge accused Plaintiff of violating the Code of Conduct provision prohibiting employees from refusing to perform assigned duties and was supported by thirty-one specifications alleging instances in which Plaintiff had failed to complete assignments between May 31, 2019, and November 9, 2020. The second charge accused Plaintiff of violating the Code of Conduct provision prohibiting employees from disrupting DYCD's operations and was supported by a specification referencing the same alleged failures to complete work underlying the first charge. The November 2020 Notice explained why the at-issue tasks fell within the scope of Plaintiff's duties and detailed the training materials and guidance that had been provided to Plaintiff. The November 2020 Notice sought a fifteen-day unpaid suspension. DYCD held a conference on the charges and granted a suspension. The record reflects that Plaintiff's suspension was not more than eight days.

### F. 2021 to 2025 -- The Instant Lawsuit, DYCD's Reorganization and Plaintiff's Termination

On or about May 3, 2021, the EEOC issued Plaintiff a Notice of Right to Sue in connection with her May 2020 EEOC charge. On July 23, 2021, Plaintiff commenced the instant action against Defendants, alleging disability discrimination and retaliation under the ADA, NYSHRL and NYCHRL and retaliation under the FMLA.

On July 27, 2022, Sanmoogan emailed Bailey stating, "I have been sending legal sets of emails documenting all the times [Plaintiff] was asked to complete [a] task within a set deadline that she failed to complete. I have sent over about 20-35 instances of this."

On April 27, 2023, Sanmoogan sent Plaintiff an email titled "Failure to perform assigned tasks." The email stated that Plaintiff had failed to complete on time tasks that were "well within the scope" of her Tasks and Standards, including financial reports, briefing sheets and budget modifications. The email again reminded Plaintiff of DYCD's Code of Conduct and the potential for disciplinary action.

On May 17, 2023, DYCD issued Plaintiff a second Notice and Statement of Charges and Specifications (the "May 2023 Notice") with a request for termination. Like the November 2020 Notice, the May 2023 Notice accused Plaintiff of refusing to perform assigned work and disrupting agency operations. This time, the first charge was supported by forty-four specifications alleging instances in which Plaintiff failed to complete assignments between October 13, 2021, and May 16, 2023. The May 2023 Notice again explained why the at-issue tasks fell within Plaintiff's job duties and detailed the additional training and guidance that Plaintiff's supervisors had provided. After holding two conferences on the charges, on August 11, 2023, DYCD issued a finding that termination was the appropriate penalty.

Around the same time, DYCD reorganized the Bureau of Budget and Finance into two new units: (1) Financial Management (for expense-related work) and (2) Grants Management and Revenue (for revenue-related work). On May 26, 2023, Sanmoogan informed Plaintiff that she would be assigned to the Grants Management and Revenue Unit. Plaintiff sent an email objecting to the assignment, stating that she was not familiar with revenue work and that "[w]ith my medical condition, it's better for me to continue doing what I am familiar with." Sanmoogan

forwarded Plaintiff's email to Bailey and others; Bailey responded that "there are other staff who are taking on responsibilities they didn't have before and are not afforded the luxury [Plaintiff] is request[ing] below."

Plaintiff was formally terminated by DYCD on August 14, 2025. Her termination letter stated that implementation of the August 2023 disciplinary finding had been delayed "[d]ue to administrative error during office re-organization."

## II. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[2] *Eisenhauer v. Culinary Inst. of Am.*, 84 F.4th 507, 515 (2d Cir. 2023). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Wildlife Preserves, Inc. v. Romero*, 153 F.4th 192, 205 n.14 (2d Cir. 2025).

"In deciding whether to award summary judgment, the court must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Torcivia v. Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021). When the movant properly supports its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by citing to particular parts of materials in the record. *See* Fed. R. Civ. P. 56(c)(1)(A). "A party opposing summary judgment normally does not show the existence of a

[2] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted, and all alterations are adopted.

genuine issue of fact to be tried merely by making assertions that are based on speculation or are conclusory." *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021).

### B. *McDonnell Douglas* Framework

At summary judgment, disability discrimination claims under the ADA are analyzed under the burden-shifting framework originally established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013). The *McDonnell Douglas* framework also applies to retaliation claims under the ADA, *Tafolla v. Heilig*, 80 F.4th 111, 125 (2d Cir. 2023), and retaliation claims under the FMLA, *Haran v. Orange Bus. Servs., Inc.*, 160 F.4th 51, 58 (2d Cir. 2025).

Under the *McDonnell Douglas* framework, the plaintiff must first "establish a prima facie case of discrimination." *Bart v. Golub Corp.*, 96 F.4th 566, 570 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 173 (2024). "Once the plaintiff has established a prima facie case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its adverse action." *Id.* "Upon that showing, the burden then shifts back to the plaintiff to prove that the employer's stated reason was pretext for discrimination." *Id.* Because "[t]he purpose of this burden-shifting is to discourage dismissal of . . . claims without an employer having to set forth a legitimate reason for the adverse action," the plaintiff's "burden to establish an initial prima facie case is, by design, minimal and de minimis." *Kelleher v. Fred A. Cook, Inc.*, 939 F.3d 465, 468 (2d Cir. 2019). Ultimately, "[a] grant of summary judgment is proper only if the evidence of discriminatory intent is so slight that no rational jury could find in plaintiff's favor." *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994); *accord Bryant v. Iheanacho*, 859 F. App'x 604, 605 (2d Cir. 2021) (summary order).

## III. DISCUSSION

### A. ADA Disability Discrimination Claim (Count I)

The First Supplemental Complaint (the "Complaint"), which is the operative complaint, asserts a disability discrimination claim under the ADA based on adverse employment action and failure to provide reasonable accommodation. Defendants' motion for summary judgment on this claim is granted.

The ADA prohibits discrimination "on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Disability discrimination claims under the ADA may be brought under a theory of adverse employment action or failure to provide reasonable accommodation. *See Tafolla*, 80 F.4th at 118. At summary judgment, both types of claims are analyzed under the *McDonnell Douglas* framework. *See Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 71 (2d Cir. 2019) (adverse employment action); *Tafolla*, 80 F.4th at 118 (failure to accommodate).

#### 1. Discrimination Based on Adverse Employment Action

The disability discrimination claim based on adverse employment action fails because, while Plaintiff can establish a prima facie case of discrimination, no reasonable jury could find -- based on all the evidence -- that discrimination was a but-for cause of the challenged adverse employment actions.

##### a. Prima Facie Case

To establish a prima facie case of discrimination based on adverse employment action under the ADA, a plaintiff must show that "(1) [her] employer is subject to the ADA; (2) [s]he was disabled within the meaning of the ADA; (3) [s]he was otherwise qualified to perform the

essential functions of [her] job, with or without reasonable accommodation; and (4) [s]he suffered adverse employment action because of [her] disability." *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020) (per curiam). To prevail ultimately on an employment discrimination case under the ADA, the plaintiff must "prove that discrimination was the but-for cause of any adverse employment action." *Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019). Courts in this Circuit have applied this causation standard to the fourth element of the prima facie case. *See, e.g.*, *Deitrick v. Inwood Farms, LLC*, No. 22 Civ. 9466, 2026 WL 879158, at *6 (S.D.N.Y. Mar. 31, 2026); *Matias v. Montefiore Med. Ctr.*, No. 20 Civ. 2849, 2022 WL 4448585, at *5 (S.D.N.Y. Sep. 23, 2022).

Defendants do not dispute the first element, that DYCD is subject to the ADA, and the record establishes the remaining elements for purposes of a prima facie case, as discussed below.

**(1) Disability**

The evidence supports a prima facie finding that Plaintiff's palatal myoclonus is a disability within the meaning of the ADA. The same is not true of Plaintiff's anxiety disorder. A person has a "disability" under the ADA if she has "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). The EEOC regulations implementing the ADA, which are afforded "great deference" in the Second Circuit, *Francis v. City of Meriden*, 129 F.3d 281, 283 n.1 (2d Cir. 1997), define a physical or mental impairment to include (1) "[a]ny physiological disorder or condition . . . affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, [and] respiratory (including speech organs)" and (2) "[a]ny mental or psychological disorder, such as . . . emotional or mental illness." 29 C.F.R. § 1630.2(h)(1)-(2). The ADA defines "major life activities" to include, among other things, "caring for oneself, performing manual tasks, seeing,

hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

In amending the ADA in 2008, Congress "instructed courts that the 'definition of disability shall be construed in favor of broad coverage of individuals,' and that an impairment that 'substantially limits one major life activity need not limit other major life activities in order to be considered a disability.'" *Woolf*, 949 F.3d at 94 (quoting 42 U.S.C. § 12102(4)(A), (C)). Accordingly, "the substantial-limitation requirement . . . is not an exacting one." *Id.* The EEOC regulations similarly provide that "[a]n impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii).

Applying these principles, Plaintiff has made a prima facie showing that her palatal myoclonus is a disability under the ADA. First, there is no genuine dispute that palatal myoclonus is a physical impairment affecting Plaintiff's speech organs, including her throat and palate. Second, Plaintiff has identified speaking and eating as major life activities impaired by her condition, both of which are expressly recognized under the ADA. *See* 42 U.S.C. § 12102(2)(A). Third, Plaintiff has produced evidence that her condition substantially limits her ability to speak and eat. According to Plaintiff's doctor, speaking and chewing cause Plaintiff's palate to spasm. Plaintiff's doctor prohibited Plaintiff from excessive speaking at work, advised Plaintiff to limit continuous speaking to ten-minute intervals followed by extended periods of silence and placed Plaintiff on a modified diet. The evidence, construed in Plaintiff's favor,

shows that her palatal myoclonus substantially limits her ability to speak and eat "as compared to most people in the general population." *See* 29 C.F.R. § 1630.2(j)(1)(ii).

Applying the same principles, Plaintiff has not made a prima facie showing that her anxiety disorder is a disability under the ADA. The Second Circuit recognizes the "longstanding, common-sense principle of law" that "employees who are precluded only from doing their specific job, or from working under a specific supervisor, do not have a 'disability.'" *Woolf*, 949 F.3d at 94; *accord Freeman v. Kirisits*, 818 F. App'x 34, 40 (2d Cir. 2020) (summary order) (finding no ADA disability where complaint alleged that plaintiff was "willing and able" to work anywhere in hospital besides his particular unit); *Shields v. NYC Health & Hosps. Corp.*, 489 F. Supp. 3d 155, 164 (E.D.N.Y. 2020) (same where plaintiff alleged that his disabilities prevented him from working with two specific individuals). The record consistently reflects that Plaintiff's anxiety was tied to her supervisors and workload. Plaintiff repeatedly stated that transferring units would alleviate her anxiety and later noted that after Sanmoogan reduced her workload, she became less stressed and no longer required anxiety medication. This evidence shows that Plaintiff's anxiety was tied to a particular workplace environment rather than to a "class or broad range of jobs." *See Woolf*, 949 F.3d at 95.

Plaintiff argues that her anxiety disorder should be considered together with her palatal myoclonus because the former exacerbates the latter. That relationship may bear on the nature and severity of Plaintiff's palatal myoclonus, but it does not establish that Plaintiff's anxiety independently qualifies as a disability under the ADA.

**(2) Qualified Individual**

Plaintiff has made a prima facie showing that she was a qualified individual. Under the ADA, a "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."

42 U.S.C. § 12111(8). At the prima facie stage, the plaintiff's burden is minimal and may be satisfied by showing that she "possesses the basic skills necessary for performance of the job." *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016). "[E]specially where discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw." *Id.*

Defendants assert that the essential functions of Plaintiff's job were established by her Tasks and Standards. As a Senior Budget Analyst, Plaintiff's duties included overseeing spending and project activities for specified City programs, preparing budget and expense reports, performing tasks relating to the CSBG portfolio, preparing budget modifications and training subordinates. The record contains evidence that Plaintiff had the skills and ability necessary to perform those duties. For example, both the May 2020 Memorandum and the November 2020 Notice stated that Plaintiff failed to submit requested reports despite demonstrating the "ability to complete the task." Sanmoogan also testified that Plaintiff's performance was "exemplary" until her leave in May 2018. That is sufficient for a prima facie case.

Defendants argue that Plaintiff's requests for less work show that she was unable to perform the essential functions of her job. The argument that Plaintiff could not or would not complete the volume of work assigned to her is misplaced at this stage of the analysis, which requires only a showing of the "basic skills" necessary for the job. *See Kovaco*, 834 F.3d at 136 n.21 ("[T]he qualification prong must not be interpreted in such a way as to shift onto the plaintiff an obligation to anticipate and disprove, in his *prima facie* case, the employer's proffer of a legitimate, non-discriminatory basis for its decision."); *Gregory v. Daly*, 243 F.3d 687, 697 n.9 (2d Cir. 2001) (explaining that "the *de minimis* character of the qualification requirement"

means that "even were [plaintiff] ultimately to prove her qualifications for the purposes of her *prima facie* case, she might nonetheless fail to prove . . . that discrimination was the basis for [the employer]'s adverse decisions").

**(3) Adverse Employment Action**

The record establishes that Plaintiff suffered two adverse employment actions. The unpaid suspension of approximately eight days resulting from the November 2020 Notice and the termination of employment resulting from the May 2023 Notice are both legally recognized adverse employment actions. *See Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223-24 (2d Cir. 2001) (unpaid suspension); *Fox*, 918 F.3d at 71 (termination).

**(4) Causation**

Plaintiff has made a prima facie showing that discrimination was a but-for cause of her suspension and later termination. But-for causation does not require proof that discrimination "was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the [discriminatory] motive." *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018). Before Plaintiff's May 2018 medical leave, Sanmoogan considered her an "exemplary employee" and did not recall her having previously been disciplined. Only eight days after Plaintiff's return from leave, Sanmoogan issued her the October 2018 Memorandum. In contemporaneous internal correspondence, Vachiraprapun stated that issuing a formal memorandum would allow DYCD to "get started with the progressive discipline steps" against Plaintiff, and Sanmoogan responded, "Excellent!" Around the same time, Thornton circulated Plaintiff's medical notes and wrote, "Perhaps we need [to] clarify what is meant by 'overwork or stress,'" to which Vachiraprapun responded, "Please clarify that for me, as well. Maybe I should be re-writing my T&S [Tasks & Standards]!!" Construed in Plaintiff's favor, the close temporal proximity of only eight days between her return from medical leave and the initiation of

"progressive discipline," and the contemporaneous comments concerning her medical condition, are sufficient to satisfy Plaintiff's minimal burden at the prima facie stage.

**b. Legitimate, Non-Discriminatory Reason**

Because Plaintiff has established a prima facie case of discrimination, the burden shifts to Defendants to articulate a legitimate, non-discriminatory reason for Plaintiff's suspension and termination. *See Fox*, 918 F.3d at 71. Defendants have met that burden by asserting that Plaintiff was first suspended and ultimately terminated due to poor work performance. *See Uttarwar v. Lazard Asset Mgmt. LLC*, No. 22 Civ. 8139, 2024 WL 1251177, at *12 (S.D.N.Y. Mar. 22, 2024) (noting that "[c]ourts in this Circuit routinely find that evidence indicating unsatisfactory work performance by the plaintiff is sufficient to establish a legitimate, non-discriminatory reason for an adverse employment action" and collecting cases), *aff'd*, No. 24-1085, 2025 WL 704278 (2d Cir. Mar. 5, 2025).

**c. Pretext and Causation**

Because Defendants have articulated a legitimate, non-discriminatory reason for the adverse actions, the burden shifts back to Plaintiff to show that Defendants' stated reason was pretextual -- i.e., was not the actual reason -- and that disability discrimination was a but-for cause of her suspension and termination. *See Fox*, 918 F.3d at 71; *Natofsky*, 921 F.3d at 348. Plaintiff has not met that burden.

First, Plaintiff has not shown that Defendants' stated reason of poor work performance was pretextual. The record contains extensive evidence supporting Defendants' performance-based explanation. The November 2020 and May 2023 Notices identify dozens of instances in which Plaintiff either failed to complete an assigned task outright or failed to complete it by the deadline, often requiring coworkers or supervisors to complete the tasks on her behalf. Those

charges followed repeated warnings, counseling and efforts to address Plaintiff's performance over a period of years. Plaintiff's performance issues persisted even after DYCD provided accommodations, including text-to-speech technology, permission to communicate by email and a reduced workload. Plaintiff asserts generally that the allegations in the notices were untrue but submits little evidence undermining their factual basis. While Sanmoogan testified that she did not recall whether Plaintiff ever told her that she "would not perform a duty," Plaintiff points to no evidence rebutting any of the seventy-five specific instances listed in the November 2020 and May 2023 Notices.

Second, Plaintiff has not proffered evidence sufficient for a reasonable jury to find that disability discrimination was an additional but-for cause of her suspension and termination. Because an adverse employment action may have multiple but-for causes, *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 275 (2d Cir. 2023), an ADA discrimination claim may survive summary judgment despite a legitimate reason for the challenged action if the evidence permits the jury to find that discriminatory animus was an additional but-for cause. Plaintiff argues that the many instances of performance deficiencies were caused by her disability and that Defendants therefore disciplined her because of her disability, but the record does not support that inference. The medical restrictions associated with Plaintiff's palatal myoclonus were related to "overtime or excessive speaking work." By contrast, the deficiencies underlying the disciplinary actions concerned incomplete or untimely work, failure to perform tasks correctly despite receiving training and disputes over whether particular tasks fell within Plaintiff's responsibilities -- all despite the fact that Plaintiff was no longer required to speak and, for part of the relevant period, had a reduced workload. No reasonable jury could find that, had Plaintiff not suffered from palatal myoclonus, she would not have been suspended or terminated.

Plaintiff also suggests that Defendants increased her workload and imposed unreasonable deadlines because of her disability, thereby setting her up to fail, but does not provide sufficient evidence to support this assertion. For example, Plaintiff alleges that in one instance, Sanmoogan gave her one hour to complete a task while thanking another employee who took four months to complete a similar task. But Plaintiff testified that she did not know the employee's title and that the assignments were not identical. Plaintiff asserts that her workload was increased after she returned from leave but acknowledges that her workload was in fact reduced in 2019, a year before the first disciplinary charges. On this record, no reasonable jury could infer that Defendants manipulated Plaintiff's workload or deadlines because of her disability or that any such manipulation caused her suspension or termination.

Plaintiff also points to internal emails that she contends demonstrate hostility toward her disabilities, including (1) the emails mentioned in Section III.A.1.a(4) above, (2) Phanor's statement, "[B]ack on the ranch she still continues this mess," in response to Plaintiff's assertion that an assigned task was not her responsibility and (3) Vachiraprapun's and Thornton's characterization of a meeting agenda concerning Plaintiff's accommodation requests as "hilarious." Construed in Plaintiff's favor, these emails, together with the other evidence discussed above, are sufficient to satisfy Plaintiff's minimal burden at the prima facie stage. But viewed against the record as a whole, including the extensive contemporaneous documentation of Plaintiff's performance issues, the emails are insufficient to permit a reasonable jury to conclude that disability discrimination was a but-for cause of Plaintiff's suspension or termination. The evidence shows that Defendants would have taken the same disciplinary actions against Plaintiff even absent discriminatory animus.

No reasonable jury could conclude that but for disability animus, Plaintiff would not have been suspended or terminated. Defendants are entitled to summary judgment on Plaintiff's ADA discrimination claim to the extent it is based on adverse employment action.

**2. Discrimination Based on Failure to Accommodate**

The disability discrimination claim based on failure to accommodate fails because Plaintiff cannot establish a prima facie case of discrimination. To establish a prima facie case of discrimination based on failure to accommodate under the ADA, a plaintiff must show by a preponderance of the evidence that "(1) [her] employer is subject to the ADA; (2) [s]he was disabled within the meaning of the ADA; (3) [s]he was otherwise qualified to perform the essential function of [her] job, with or without reasonable accommodation; and (4) [her] employer refused to make a reasonable accommodation." *Tudor v. Whitehall Cent. Sch. Dist.*, 132 F.4th 242, 246 (2d Cir. 2025).

Plaintiff cannot establish a prima facie case because -- while, as discussed above, the first three elements are satisfied -- the undisputed evidence shows that Defendants provided Plaintiff with reasonable accommodations for her palatal myoclonus. In November 2018, Plaintiff requested that her duties entail no speaking and that she be limited to ten minutes of continuous speaking at a time. Defendants granted Plaintiff's requests by providing her with text-to-speech software and permitting her to communicate via email, and Plaintiff acknowledged receiving those accommodations. "It is axiomatic that a claim for failure to accommodate does not lie where the accommodation received is the accommodation the plaintiff requested." *Dean v. Univ. at Buffalo Sch. of Med. and Biomedical Scis.*, 804 F.3d 178, 188 (2d Cir. 2015).

Plaintiff also acknowledges that Defendants later reduced her workload, even though that accommodation was requested in connection with Plaintiff's anxiety disorder rather than her

palatal myoclonus. While Plaintiff's doctor noted that "Excessive Stress and Overuse such as Speaking or Chewing" could worsen her palatal myoclonus symptoms, the doctor did not prescribe a generally reduced workload. Rather, the restrictions in the doctor's note concerned "overtime and excessive speaking work," neither of which Plaintiff asserts that Defendants imposed. Because Plaintiff's anxiety disorder does not constitute a disability under the ADA, any alleged failure to provide additional accommodations relating to that condition cannot support her failure-to-accommodate claim. *See Buckley v. Consol. Edison Co. of N.Y., Inc.*, 155 F.3d 150, 156 (2d Cir. 1998) (the ADA "does not require an employer to make accommodation for an impairment that is not a disability within the meaning of the Act"); *Philbert v. City of New York*, No. 21 Civ. 3119, 2022 WL 94574, at *17 (S.D.N.Y. Jan. 7, 2022) (same).

Plaintiff argues that Sanmoogan "resisted implementing [the accommodations], not wanting to deal with Plaintiff at all," principally relying on DYCD's February 2020 attempt to transfer Plaintiff to the Cornerstone Unit. That argument is unpersuasive. The record reflects that DYCD sought the transfer at least in part because the new role would require less speaking, an accommodation that Plaintiff herself had requested. In opposing the transfer, Plaintiff argued that Sanmoogan had already reduced her workload and permitted her to communicate via email. Ultimately, DYCD decided not to transfer Plaintiff because of her objections. This evidence does not show that DYCD was unwilling to accommodate Plaintiff, but rather the opposite.

Because the undisputed evidence establishes that Defendants provided Plaintiff the accommodations she requested for her ADA-qualifying disability, Defendants are entitled to summary judgment on Plaintiff's ADA discrimination claim to the extent it is based on failure to accommodate.

### B. ADA Retaliation Claim (Count IV)

The Complaint asserts a retaliation claim under the ADA. Defendants' motion for summary judgment on this claim is granted.

The ADA prohibits an employer from "discriminat[ing] against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" the ADA. 42 U.S.C. § 12203(a). At summary judgment, ADA retaliation claims are analyzed under the *McDonnell Douglas* framework. *Tafolla*, 80 F.4th at 125. The ADA retaliation claim fails because, while Plaintiff can establish a prima facie case of retaliation, no reasonable jury could find that retaliation was a but-for cause of the challenged adverse actions.

#### 1. Prima Facie Case

To establish a prima facie case of retaliation under the ADA, a plaintiff must show that "(i) [she] was engaged in protected activity; (ii) the alleged retaliator knew that [she] was involved in protected activity; (iii) an adverse decision or course of action was taken against [her]; and (iv) a causal connection exists between the protected activity and the adverse action." *Id.* At the prima facie stage, a plaintiff may demonstrate causation "indirectly through temporal proximity" by "showing that the protected activity was closely followed in time by the adverse employment action." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013).

Defendants do not dispute that Plaintiff engaged in protected activity or that they knew of the activity. Nor do they dispute that the disciplinary charges resulting in Plaintiff's suspension and eventual termination are adverse actions. Rather, they argue that (1) Plaintiff cannot

establish a causal connection between her protected activity and those actions and (2) Plaintiff's remaining allegations are not actionable retaliation.

First, the record supports a prima facie showing of causation. Four months after the EEOC notified DYCD of Plaintiff's charge, DYCD issued the November 2020 Notice seeking Plaintiff's suspension. The May 2023 Notice requesting Plaintiff's termination alleged instances of Plaintiff's failure to complete work beginning in October 2021 -- three months after Plaintiff filed the instant lawsuit. This evidence is sufficient to satisfy Plaintiff's "minimal and de minimis" burden to show causation at the prima facie stage. *See Kelleher*, 939 F.3d at 468.

Second, the Court need not determine whether each of Plaintiff's remaining challenged acts independently constitutes an adverse action because, as discussed below, even assuming that they do, Plaintiff cannot establish that retaliation was a but-for cause of those actions.

**2. Legitimate, Non-Retaliatory Reason**

Because Plaintiff has established a prima facie case of retaliation, the burden shifts to Defendants to articulate a legitimate, non-retaliatory reason for the adverse actions. *See Zann Kwan*, 737 F.3d at 845. As discussed in Section III.A.1.b above, Defendants have met that burden by asserting that the actions were based on Plaintiff's poor work performance.

**3. Pretext and Causation**

Because Defendants have articulated a legitimate, non-retaliatory reason for the adverse actions, the burden shifts back to Plaintiff to show that Defendants' stated reason was pretextual and that retaliation was a but-for cause of those actions. *See id.* Plaintiff must show that "but for the protected activity, the adverse action would not have been taken." *Sharikov v. Philips Med. Sys. MR, Inc.*, 103 F.4th 159, 170 (2d Cir. 2024). Plaintiff has not made that showing.

First, for the reasons discussed in Section III.A.1.c above, Plaintiff has not shown that Defendants' performance-based explanation for her suspension and termination was pretextual. Plaintiff contends that the disciplinary charges were false or "dubious," but, as discussed above, the record contains extensive contemporaneous evidence supporting the performance deficiencies underlying those charges, and the evidence Plaintiff identifies would not permit a reasonable jury to conclude that Defendants' stated reason was false.

Second, Plaintiff has not produced sufficient evidence for a reasonable jury to find that retaliation was an additional but-for cause of the challenged actions. Plaintiff contends that after she filed the instant action, Defendants "systematically" documented her performance as part of an escalating campaign of retaliation. Plaintiff points to a July 2022 statement by Sanmoogan that she had sent Legal "20-35 instances" of Plaintiff's failure to meet deadlines and testimony by Bailey that Plaintiff's pending lawsuit resulted in "heightened review" of her January 2023 performance evaluation. While that evidence may permit an inference that the instant litigation caused increased scrutiny and documentation of Plaintiff's performance, it does not -- without more -- permit a reasonable jury to find that Defendants fabricated Plaintiff's performance deficiencies or imposed discipline that would not otherwise have occurred. To the extent Plaintiff relies on the temporal proximity between her protected activity and these actions, "temporal proximity alone is insufficient to defeat summary judgment at the pretext stage." *See Zann Kwan*, 737 F.3d at 847. "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Haran*, 160 F.4th at 60.

Plaintiff's remaining theories likewise do not establish but-for causation. To the extent Plaintiff relies on Defendants' alleged increase of her workload or failure to accommodate her

disability, those theories fail for the reasons discussed in Sections III.A.1.c and III.A.2 above. Plaintiff also argues that Defendants retaliated against her by assigning her to the Grants Management and Revenue Unit following DYCD's 2023 reorganization, contending that she had "almost no experience" with revenue work. But the record reflects that Plaintiff performed at least some revenue-related work before the reassignment, that the reassignment was based at least in part on Plaintiff's capabilities and bandwidth and that other employees were also given new responsibilities as part of DYCD's reorganization. Plaintiff identifies no evidence from which a reasonable jury could conclude that the assignment was motivated by retaliatory animus.

No reasonable jury could conclude that retaliation was a but-for cause of the challenged actions. Defendants are entitled to summary judgment on Plaintiff's ADA retaliation claim.

**C. FMLA Retaliation Claim (Count VII)**

The Complaint asserts a retaliation claim under the FMLA. Defendants' motion for summary judgment on this claim is granted.

The FMLA prohibits an employer from interfering with "the exercise of or the attempt to exercise" any right under the statute. 29 U.S.C. § 2615(a)(1). FMLA retaliation claims are analyzed under the *McDonnell Douglas* framework. *Haran*, 160 F.4th at 58. Unlike an ADA retaliation claim, an FMLA retaliation claim does not require proof of but-for causation; rather, a plaintiff must produce evidence from which a reasonable jury could find that her exercise of FMLA rights was a "motivating factor" in the adverse employment action. *See Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir. 2017). The FMLA retaliation claim fails because, while Plaintiff can establish a prima facie case of retaliation, no reasonable jury could find that her exercise of FMLA rights was a motivating factor in the challenged adverse actions.

**1. Prima Facie Case**

To establish a prima facie case of retaliation under the FMLA, a plaintiff must show that "1) she exercised rights protected under the FMLA; 2) she was qualified for her position; 3) she suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Haran*, 160 F.4th at 58-59. Defendants do not dispute that Plaintiff exercised rights protected under the FMLA or that she was qualified for her position. Rather, they argue that Plaintiff cannot show an adverse employment action or the required causal relationship between her exercise of FMLA rights and the alleged adverse actions.

First, as discussed in Section III.A.1.a(3) above, Plaintiff suffered adverse employment actions when she was suspended and ultimately terminated. The Court need not determine whether each of Plaintiff's remaining challenged acts independently constitutes an adverse employment action because, as discussed below, even assuming that they do, Plaintiff cannot establish that her exercise of FMLA rights was a motivating factor in those actions.

Second, the evidence is sufficient to satisfy Plaintiff's minimal burden to show causation at the prima facie stage. Plaintiff took FMLA leave from May 2018 through July 2018, followed immediately by unpaid non-FMLA leave from July 2018 to October 2018. She was written up eight days after returning to work in October 2018. That temporal proximity is sufficient for a prima facie case.

**2. Legitimate, Non-Retaliatory Reason**

Because Plaintiff has established a prima facie case of retaliation, the burden shifts to Defendants to articulate a legitimate, non-retaliatory reason for the adverse actions. *See id.* at 59.

As discussed in Section III.A.1.b above, Defendants have met that burden by asserting that the actions were based on Plaintiff's poor work performance.

**3. Pretext and Causation**

Because Defendants have articulated a legitimate, non-retaliatory reason for the adverse actions, the burden shifts back to Plaintiff to show that Defendants' stated reason was pretextual and that Plaintiff's exercise of FMLA rights was a motivating factor in the challenged conduct. *See id.*; *Woods*, 864 F.3d at 165. Plaintiff has not made that showing.

First, for the reasons discussed in Section III.A.1.c above, Plaintiff has not shown that Defendants' explanation for her suspension and termination was pretextual. Second, Plaintiff has not proffered evidence sufficient for a reasonable jury to find that her 2018 FMLA leave nevertheless was a motivating factor in the challenged adverse actions.[3] To the extent Plaintiff relies on the temporal proximity between her FMLA leave and Defendants' issuance of the October 2018 Memorandum and systematic documentation of her performance issues, temporal proximity alone is insufficient to defeat summary judgment at the pretext stage of an FMLA retaliation claim. *Haran*, 160 F.4th at 59. Plaintiff identifies no other evidence specifically connecting her FMLA leave to any disciplinary actions. Plaintiff asserts generally that there is a causal connection between the FMLA leave and her termination, but her termination in 2025 followed years of documented performance issues, warnings and counseling.

[3] Plaintiff's Rule 56.1 Counterstatement identifies evidence concerning a separate request for FMLA leave in June 2021. The Complaint, however, does not mention that request or assert retaliation based on it. Rather, the Complaint identifies the protected activity as Plaintiff's taking FMLA leave in 2018 and alleges retaliation after she returned from that leave. Plaintiff likewise frames the FMLA retaliation claim in her summary judgment opposition as arising from adverse actions "since her return from her FMLA leave on October 11, 2018." The Court therefore does not consider a distinct FMLA retaliation theory based on the 2021 request raised for the first time at summary judgment.

The emails identified by Plaintiff as evidence of alleged hostility, discussed in Section III.A.1.a(4) above, likewise do not support a finding that her 2018 FMLA leave was a motivating factor in the discipline against her. Most of the emails concern Plaintiff's disabilities, accommodation requests and work performance rather than her FMLA leave. One email identified by Plaintiff does concern her 2021 FMLA leave request. Plaintiff characterizes Thornton's statement that she was "not sure if there is some 'intention' in submitting such starkly different medical recommendations" as questioning Plaintiff's motives in seeking FMLA leave. Read in context, however, the email concerned Thornton's confusion over medical documentation submitted by Plaintiff that appeared to state both that Plaintiff could not work and that she could work remotely. Thornton's statement does not, without more, permit an inference of retaliatory animus. In any event, the email concerns Plaintiff's separate 2021 FMLA request, not the 2018 FMLA leave underlying the retaliation claim.

To the extent Plaintiff relies on Defendants' alleged increase of her workload, failure to accommodate her disability or February 2020 attempt to transfer her to a different unit, those theories fail for the reasons discussed in Sections III.A.1.c and III.A.2 above. More fundamentally, that evidence does not permit a reasonable jury to find that Plaintiff's FMLA leave, as distinct from the disability, accommodation and performance disputes discussed above, was a motivating factor in Defendants' actions.

No reasonable jury could conclude that Plaintiff's exercise of FMLA rights in 2018 was a motivating factor in the challenged actions. Defendants are entitled to summary judgment on Plaintiff's FMLA retaliation claim.

### D. NYSHRL and NYCHRL Claims (Counts II, III, V and VI)

Having dismissed all claims over which it has original jurisdiction, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining claims under the NYSHRL and NYCHRL, which include the claims against the Individual Defendants and are subject to the Court's jurisdiction solely because of the now-dismissed federal claims.

A district court may decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine -- judicial economy, convenience, fairness, and comity -- will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013). "[W]hen all federal claims are dismissed before trial, the remaining state and local law claims should typically be dismissed, too." *Dolce v. Connetquot Cent. Sch. Dist.*, No. 25-1197, 2026 WL 2560338, at *8 (2d Cir. Aug. 31, 2026).

Plaintiff's state and local claims involve no federal interest and are governed by a different legal standard than their counterpart federal claims. "[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing the NYCHRL's provisions broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013). Since *Mihalik* was decided, the NYSHRL has been amended to align more closely with the NYCHRL than with federal law. *Qorrolli v. Metro. Dental Assocs.*,

124 F.4th 115, 122-23 (2d Cir. 2024); *see Syeed v. Bloomberg L.P.*, 235 N.E.3d 351, 354 (N.Y. 2024) (construing NYSHRL and NYCHRL claims together).

Because of these differences between state and city law on the one hand and federal law on the other, and because the federal claims have all been dismissed, principles of comity and judicial economy favor allowing the New York courts to address the state and city human rights claims. *See, e.g.*, *Deitrick*, 2026 WL 879158, at *12-13 (declining to exercise supplemental jurisdiction over NYSHRL and NYCHRL claims after granting summary judgment to defendant on federal employment claims); *Polanco v. N.Y.C. Sch. Constr. Auth.*, No. 25 Civ. 5815, 2026 WL 2652580, at *7 (E.D.N.Y. Aug. 25, 2026) (same); *Nance v. N.Y. Pub. Int. Rsch. Grp. Fund, Inc.*, No. 23 Civ. 3030, 2025 WL 965883, at *12-13 (S.D.N.Y. Mar. 31, 2025) (same). The Court therefore declines to exercise supplemental jurisdiction over Plaintiff's NYSHRL and NYCHRL claims, which are dismissed without prejudice to refiling in state court.

## IV. CONCLUSION

For the reasons above, Defendants' motion for summary judgment is **GRANTED** as to Plaintiff's ADA and FMLA claims. The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining claims under the NYSHRL and NYCHRL, which are **DISMISSED** without prejudice to refiling in state court.

The Clerk of Court is respectfully directed to close the motion at Dkt. No. 172, enter judgment for Defendants and close this case.

Dated: September 29, 2026
New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE